UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>c/o U.S. Attorney's Office<br>601 D Street, NW<br>Washington, DC 20530,<br><br>Plaintiff,<br><br>v.<br><br>NINE CRYPTOCURRENCY WALLETS<br>HELD BY TETHER LIMITED AND SEVEN<br>CRYPTOCURRENCY WALLETS HELD BY<br>BINANCE HOLDINGS LTD,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civ. A. No.<br><br><br>**FILED UNDER SEAL** |

**UNITED STATES' VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

COMES NOW, Plaintiff the United States of America (the "United States"), by and through the United States Attorney's Office for the District of Columbia, which brings this verified complaint for forfeiture in a civil action *in rem*, in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure, against: nine cryptocurrency wallets held by Tether Limited ("Tether") and seven cryptocurrency wallets held by Binance Holdings Ltd. ("Binance"), and alleges as follows:

**NATURE OF THE ACTION AND DEFENDANT *IN REM***

1.      This *in rem* forfeiture action arises out of an investigation by the Federal Bureau of Investigation ("FBI") into use of the U.S. financial system to aid and support Hamas, a designated foreign terrorist organization ("FTO") in violation of the Money Laundering Control Act, 18 U.S.C. § 1956; and statutes prohibiting the material support of terrorism, 18 U.S.C. § 2339B.

2.      Specifically, the United States is investigating persons known and unknown to the United States and their use of the U.S. financial institution aid and support Hamas, including supporting activities involving the October 7 attacks in Israel.

3.      The property subject of this action includes all funds stored in each of the following accounts (collectively "Defendant Property" or "Subject Accounts"):

    a.   Accounts held by Tether Limited:

       i.   TR2iVPD66Bm35X1JpEg5Uc8TAvw38iznVF ("Address nVF")

      ii.   THXSq7QVGE5g2GakEoAR1EoK2JvqjqsWGy ("Address WGy")

     iii.   TAUEULGrn3msvqqGqeeDzz2fEWZhTpdmgL ("Address mgL")

     iv.   TJunpRjUdinfzgVfFxAwHC5EtZzEegzt5t ("Address t5t")

      v.   TBH3kjMQaAnVdD3bepTCzhH4nYCY9TGvDc ("Address vDc")

     vi.   TUvRgYTczesQQho4cL8myZm5qJ3PxwZwm2 ("Address wm2')

    vii.   TGnJx5awW3n27r4HromU7WFccYnJRYB1o6 ("Address 1o6")

   viii.   TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc ("Address JNc")

     ix.   TPpv5jxsTso76q5n1jg1qrCNmccbRUVGKP ("Address GKP")

    b.   Accounts held by Binance Holdings Ltd.:

       i.   724346855 ("Account-6855")

      ii.   222790091 ("Account-0091")

     iii.   166560638 ("Account-0638")

     iv.   724356631 ("Account-6631")

      v.   788177294 ("Account-7294")

     vi.   797560256 ("Account-0256")

    vii.   439564744 ("Account-744")

4.      The Defendant Property is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(1), as foreign assets that afford a source of influence over Hamas, a designated FTO, which have engaged in planning and perpetrating federal crimes of terrorism as defined in 18 U.S.C. § 2332B(g)(5) against the United States, citizens or residents of the United States, or their property, and as assets, or source of influence by a person or entity over Hamas.

5.      The Defendant Property is also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it is property that was involved in, and/or is traceable to property that was involved in, a violation of the international money laundering statute, 18 U.S.C. § 1956 and 1957, or any property traceable to such property which occurred when the account user, Ahmed Y.A. Abughali ("Abhugali") and BuyCash caused U.S. Financial Institution 1 to facilitate the payment of U.S. dollars in furtherance of the transport of Iranian petroleum products with the intent to promote a specified unlawful activity, *viz.,* a violation of the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1705. *See also United States v. Bank Julius Baer & Co. Ltd. Guernsey Branch Acct. No. 121128 (Lazarenko)*, 571 F. Supp. 2d 1, 11 (D.D.C. 2008).

6.      The Defendant Property is also subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and as proceeds of specified unlawful activity, specifically violations of 50 U.S.C. §§ 1701-1709 (International Emergency Economic Powers Act).

## JURISDICTION AND VENUE

7.      This Court has *in rem* jurisdiction over the Defendant Property pursuant to 28 U.S.C. §§ 1345 and 1355. *See e.g.*, *United States v. 8,911 Type 56-1 Assault Rifles, et al,* Civ. A. No. 23-1951 (JEB), E.C.F. 11, at * 4 (D.D.C. Dec. 1, 2023).

8.      Venue is also proper within this judicial district pursuant to 28 U.S.C. § 1355(b)(2). *See, e.g.*, *One Gold Ring with Carved Gemstone*, 2019 WL 5853493, at *2 ("This court is the sole jurisdiction where such litigation is properly lodged. 28 U.S.C. § 1355(b)(2).").

## STATUTORY AUTHORITIES

1.      This investigation relates to violations of 18 U.S.C. § 18 U.S.C. § 2339B (Material support of terrorism), 18 U.S.C. § 1956 (Money laundering), 18 U.S.C. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity); 50 U.S.C. §§ 1701-1709 (the International Emergency Economic Powers Act), and conspiracy to commit the foregoing offenses in violation of 18 U.S.C. § 371 (Conspiracy) and 18 U.S.C. § 1956(h) (Money laundering conspiracy).

2.      **Material Support of Terrorism**: 18 U.S.C. § 2339B makes it a crime to knowingly provide resources to a foreign terrorist organization or attempt or conspire to do so.

3.      **Money Laundering:** 18 U.S.C. § 1956(a)(1)(A)(i) makes it a crime to conduct or attempt to conduct a financial transaction, knowing that the property involved in the transaction represents the proceeds of some form of unlawful activity, and which in fact involves the proceeds of specified unlawful activity, with the intent to promote the carrying on of a specified unlawful activity.  This offense is sometimes referred to as promotional money laundering. 18 U.S.C. § 1956(a)(1)(B)(i) makes it a crime to conduct or attempt to conduct a financial transaction, knowing that the property involved in the transaction represents the proceeds of some form of unlawful activity, and which in fact involves the proceeds of specified unlawful activity, knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity.  This offense is sometimes referred to as concealment money laundering. 18 U.S.C. § 1956(a)(2)(A)

makes it a crime to transmit, transfer or attempt to transmit or transfer funds from outside the United States to a place in the United States with the intent to promote the carrying on of a specified unlawful activity. This offense is sometimes referred to as international money laundering. *See Lazarenko*, 571 F. Supp. 2d at 11.

4.      18 U.S.C. § 1956(f) expressly provides for extraterritorial jurisdiction "if […] in the case of a non-United States person, the conduct occurs in part in the United States; and the transaction or series or related transactions involves funds or monetary instruments of a value exceeding $10,000." This includes transfers through a correspondent bank account. *Lazarenko*, 251 F. Supp. 3d 82, 92 (D.D.C. 2017).

5.      18 U.S.C. § 1956(h) criminalizes a conspiracy to violate § 1956.

6.      **Engaging in monetary transactions in property derived from specified unlawful activity:** 18 U.S.C. § 1957 makes it a crime to knowingly engage or attempt to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, provided that the offense is committed in the United States or in the special maritime and territorial jurisdiction of the United States; or the offense is committed outside the United States and such special jurisdiction, but the defendant is a United States person. *See Lazarenko*, 571 F. Supp. 2d at 11.

7.      The term "specified unlawful activity" is defined in 18 U.S.C. §§ 1956(c)(7) and 1961(1) and includes violations of 18 U.S.C. § 2339B (material support of terrorism); 18 U.S.C. § 1957 (Engaging in monetary transactions in property derived from specified unlawful activity): and 50 U.S.C. § 1705 (International Emergency Economic Powers Act).

8.      The term "financial transaction," includes "a transaction which in any way or degree affects interstate or foreign commerce ... involving the movement of funds by wire or

other means or ... a transaction involving a financial institution, which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree." 18 U.S.C. § 1956(c)(4); *See Lazarenko*, 571 F. Supp. 2d at 11.

9.     **The International Emergency Economic Powers Act**:  50 U.S.C. § 1705 makes it a crime to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued pursuant to the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. §§ 1701-1709.  Pursuant to IEEPA and other statutory authorities the President of the United States issued Executive Order 13224 on September 23, 2001, blocking all property and interests in property of designated individuals or entities deemed to have committed or pose a risk of committing acts of terrorism that threaten U.S. nationals or U.S. interests.  Executive Order 13224 further prohibited, with limited exceptions, any transaction or dealing by U.S. persons or within the United States in property or interests in property blocked pursuant to the Order, including but not limited to the making or receiving of any contribution of funds, goods, or services to or for the benefit of individuals or entities designated under the Order.

10.     Non-US persons or entities also violate IEEPA when they cause a U.S. person or entity to violate OFAC's regulations.  For example, a sanctioned Russian Oligarch who wires funds via a front company that transits through a U.S. correspondent bank, violates IEEPA by causing the correspondent banker in the U.S. to (unwittingly) export financial services to a sanctioned entity. *See In the Matter of the Seizure and Search of the Motor Yacht Tango*, No. 22-SZ-5, 2022 WL 1165569, *2 (D.D.C. Apr. 4, 2022).

## FORFEITURE AUTHORITY

11.     Forfeiture of the Defendant Property is authorized pursuant to 18 U.S.C. § 981(a)(1)(G)(i) (Forfeiture of terrorism-related property), 18 U.S.C. § 981(a)(1)(A) (Forfeiture

of property "involved in" specific offenses and property traceable thereto), and 18 U.S.C. § 981(a)(1)(C) (Forfeiture of "proceeds" of criminal offenses and property traceable thereto).

12.    **Terrorism Forfeiture Provision**:   Pursuant to 18 U.S.C. § 981(a)(1)(G)(i), "[a]ll assets, foreign or domestic … of any individual, entity, or organization engaged in planning or perpetrating any Federal crime of terrorism (as defined in 18 U.S.C. § 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property, and all assets, foreign or domestic, affording any person a source of influence over any such entity or organization" are subject to forfeiture to the United States.   Section 98l(a)(l)(G)(i) thus covers two categories of property: (1) all assets, foreign or domestic, of individuals, entities, or organizations engaged in planning or perpetrating federal crimes of terrorism; and (2) all assets, foreign or domestic, that afford any person a source of influence over an entity or organization engaged in planning or perpetrating any federal crime of terrorism.  *See, e.g., United States v. All Petroleum-Product Cargo Aboard the Bella with Int'l Mar. Org. No. 9208124*, Civil Action No. 20-1791 (JEB), 2021 U.S. Dist. LEXIS 189395, at *12-13 (D.D.C. Oct. 1, 2021) (holding that in the face of sanctions, front companies such as the defendant properties are critical to furthering the affairs of the terrorist group's enterprise, by keeping funds flowing to that organization, and thus forfeitable under 18 U.S.C. § 981(a)(1)(G)(i).") (citations omitted).   *See also United States v. Oil Tanker Bearing Int'l Mar. Org. No. 9116512 a.k.a. "Adrian Darya 1 f.k.a. "Grace 1" et al.* 480 F.Supp.3d 39, 46 (D.D.C. August 7, 2020) (holding that 981(a)(1)(G)(i)'s source of influence language is analogous to the RICO forfeiture statute, whose language it closely tracks, and that anything that furthered the affairs of the illicit enterprise or a FTO, or made the prohibited conduct less difficult, is forfeitable under those statutes).   In the face of sanctions in the U.S. and globally against Hamas,

cryptocurrency has become a source of influence because it furthers the affairs of that organization by providing it with a source of funds that is more difficult to trace and to block.

13.     Among the government's forfeiture authorities, the terrorism forfeiture provision applies to the broadest range of property.  Specifically, § 981(a)(1)(G)(i) provides for the forfeiture of *all* property, foreign or domestic, of a terrorist organization or that affords a source of influence to any entity or organization over a terrorist organization, irrespective of whether the property has any nexus to a crime or to the United States.  *See e.g., United States v. One Gold Ring with Carved Gemstone*, Civ. A. No. 16-02442 (TFH), 2019 WL 5853493, at *1-2 (D.D.C. Nov. 7, 2019) ("§ 981(a)(1)(G)(i) covers all property 'foreign or domestic.'  That is, the statute empowers the government to seek the forfeiture of property outside the United States, *which may have never touched the United States.* The broad expanse of this language is for forfeiture actions to reach all property of terrorist organizations."). (emphasis added)

14.     This civil forfeiture theory is a basis for forfeiture of all the Subject Accounts.  As set forth further below, the cryptocurrency platform BuyCash has funded and/or transacted business on behalf of Hamas and other FTOs, and these transactions afford a source of influence over these terrorist organizations.

15.     **Forfeiture of property "involved in" specific offenses**:  Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property" is subject to forfeiture to the United States.

16.     Forfeiture pursuant to these statutes applies to more than just the proceeds of the crime.  These forfeitures encompass all property "involved in" the crime or the attempted crime, which includes "clean" money that is commingled with "tainted" money derived from illicit

sources. *See* 18 U.S.C. § 983(c)(3); see e.g., *United States v. Silver*, 864 F.3d 102 (2d Cir. 2017); *United States v. Rutgard*, 116 F.3d 1270, 1286 (9th Cir. 1997). This commingling is a laundering technique that facilitates the scheme because it obfuscates the trail of the illicit funds. *See United States v. Huber*, 404 F.3d 1047, 1058 (8th Cir. 2005) (the presence of legitimate funds does not make a money laundering transaction lawful; it is only necessary to show that the transaction involves criminal proceeds).

17.     **Forfeiture of criminal "proceeds":**  Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from "proceeds" traceable to a violation of   an offense involving specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7) (which includes criminal violations of IEEPA), or a conspiracy to commit such offenses, is subject to criminal and civil forfeiture.

18.     Here, in conjunction with other evidence, transactions to and from the Subject Accounts support probable cause to believe that violations are occurring of 18 U.S.C. § 2339B (Material Support of Terrorism); 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property derived from specified unlawful activity): and 50 U.S.C. § 1705 (International Emergency Economic Powers Act).

<b>FACTS GIVING RISE TO FORFEITURE</b>

A.     <u>**Relevant Entities**</u>

i.     <u>Hamas and the Izz al-Din al-Qassam Brigades</u>

19.     On October 8, 1997, the United States Secretary of State designated Hamas as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act. On October 31, 2001, the Secretary of State also designated Hamas as a Specially Designated Global Terrorist under Executive Order 13224. The Secretary of State has also listed the following

aliases for Hamas: Islamic Resistance Movement, Harakat al-Muqawama al-Islamiya, Students of Ayyash, Students of the Engineer, Yahya Ayyash Units, Izz Al-Din Al-Qassim Brigades, Izz Al-Din Al-Qassim Forces, Izz Al-Din Al-Qassim Battalions, Izz Al-Din Al Qassam Brigades, Izz al-Din Al Qassam Forces, and Izz al-Din Al Qassam Battalions.   To date, Hamas remains a designated FTO.

20.     Hamas, and its military wing, the Izz al-Din al-Qassam Brigades, have claimed responsibility for numerous mass-casualty terrorist attacks perpetrated in Israel, the West Bank, and the Gaza Strip.

ii.     The October 2023 Attacks

21.     At approximately 6:00 a.m. local time on October 7, 2023, Hamas conducted a coordinated attack against Israel by land, air, and sea.   Hamas members, or persons fighting for Hamas (collectively, "Hamas Attackers") breached the border between the Gaza Strip and Israel, infiltrated Israel, and launched a wave of attacks focused primarily on civilians (the "October Attacks").   Hamas Attackers went house to house taking hostages and killing other victims, including at least 30 American citizens.   Homes and businesses were set on fire to extract barricaded citizens.   Hamas military commander Muhammad Al-Dief has publicly referred to the operation as "Al Aqsa Flood."   Over 200 hostages are believed to have been taken into the Gaza Strip, including twelve American citizens.

iii.     BuyCash Exchange and Ahmed M. M. Alaqad

22.     On October 18, 2023, the U.S. Treasury's Office of Foreign Asset Control ("OFAC") designated BuyCash pursuant to Executive Order ("E.O.") 13224, as amended, for having materially assisted, sponsored, or provided financial, material, or technological support for,

or goods or services to or in support of, Hamas.[1] Also on October 18, 2023, OFAC designated Ahmed M. M. Alaqad ("Alaqad") pursuant to E.O. 13224, as amended, for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of BuyCash Exchange.[2]  Based in the Gaza Strip, Alaqad has acted as BuyCash's representative and is one of the owners of BuyCash. Alaqad registered BuyCash's domain in July 2015.  In addition, OFAC sanctioned an unhosted address associated with BuyCash:  19D1iGzDr7FyAdiy3ZZdxMd6ttHj1kj6WW ("Address-6WW").

23.    As described further below, BuyCash and Alaqad have had strong links to Hamas and other FTOS for years prior to their OFAC designations, and received the equivalent of millions of dollars in crypto-currency transfers in support of these organization's illicit activities.

24.    Prior to OFAC's designation, Alaqad, who has been BuyCash's registered agent since its founding in 2015, used BuyCash as a money services business (MSB) to launder funds for various designated terror organizations including Hamas. As part of the press release accompanying its designation of BuyCash and Alaqad, OFAC detailed several instances.

    a.  In 2017, a BuyCash account was registered by individuals involved in payments for procurement of large quantities of online infrastructure on behalf of ISIS.

    b.  In September 2019, a BuyCash cryptocurrency address ending in -6WW received $2,000 from a known Al-Qaida affiliate.

    c.  In June 2021, Israel's National Bureau for Counter Terrorist Financing seized several virtual currency addresses in connection to a Hamas fundraising campaign, some of which were linked to the Izz al-Din Qassam Brigades, and one of the seized

---

[1]    https://home.treasury.gov/news/press-releases/jy1816.
[2]    *Id.*

addresses belonged to BuyCash Exchange.

25.     Law enforcement detailed five instances in 2019 where Hamas fundraising was transacted through BuyCash with direct assistance of Alaqad and that based upon its investigation, BuyCash likely caused the delivery of fiat currency to be delivered to an entity or individual associated with Hamas.

      iv.    <u>Binance Account 21201098 and 28569222, BuyCash-related Tether Address-6WW and Ahmed Y.A. Abughali</u>

26.     Between on or about 2020 and on or about 2022, law enforcement investigated individuals and organizations in a terrorist financing scheme. The investigation revealed that on multiple occasions, through Abughali, a BuyCash representative, identified as Alaqad or his proxy, provided Address-6WW as the recipient for cryptocurrency transfers.

27.     The law enforcement investigation revealed that on multiple occasions, funds were sought to be deposited with BuyCash to financially support the activities of multiple Iranian proxy terrorist groups. Abughali was informed of each of these instances and regularly provided Address-6WW as the wallet to receive the funds.

28.     The investigation further revealed that while attempting to support FTOs and the terrorist activities of violent extremists in other campaigns, Alaqad and his proxies used various BuyCash-related emails, phone numbers, and other identifiers which were used to register BuyCash Address-6WW and Binance Accounts 21201098 ("Account-1098") and 28569222 ("Account 9222").

29.     On or about January 2022, after accounts with Binance were frozen, BuyCash employees including Abughali, sought to ensure the transfer of funds using the digital asset "USDT" to continue to facilitate illicit financing of terrorist groups and Iranian proxies designated under E.O. 13224.

B.    **Relevant Accounts**

i.   Summary

30.    The FBI has obtained evidence that BuyCash and Alaqad have continued to operate after being sanctioned by OFAC. As explained more fully below, the FBI has identified ten virtual currency addresses and nine virtual currency accounts connected to BuyCash and Alaqad and their continuing operations. Two of the addresses are directly registered to Alaqad, and one of the addresses has been promoted in an online chatroom on Telegram as being a BuyCash wallet. The investigation has revealed that most if not all of these addresses and accounts are under the control of the same user or users who have acted both prior to the US sanctions, and after, in support of BuyCash's and Alaqad's continuing operations in support of Hamas.

ii.   Binance Account -1098

31.    BuyCash used social media and finance-related platforms to market its services, including the website http://buy-cash.com. On that website, BuyCash listed buycash0@gmail.com as one of its email addresses which was used to register a financial account hosted at Binance Account-1098.

32.    Between on or about April 14, 2018, to on or about January 10, 2022, Account-1098 received the equivalent of approximately $145,680 in U.S. currency from BuyCash Address-6WW. Address-6WW was referenced in OFAC's October 18, 2023, designation of BuyCash as a wallet that has been used to facilitate the transfer of virtual currency in support of known affiliates supporting terrorism.[3]

---

[3]    https://home.treasury.gov/news/press-releases/jy1816

33.     Account-1098 is registered to Abughali and was funded through a bank account registered in the United States with Financial Institution 1 which is registered to Abughali. The email address, buycash222@gmail.com, was used to open the account.

34.     Abughali advertised and promoted BuyCash via the Telegram despite that BuyCash was sanctioned by OFAC on October 18, 2023. Through a chatroom on Telegram, Abughali through @Ahmed879900 indicated that BuyCash had a new virtual currency address for individuals to conduct financial transactions. In conversations referencing Account-1098, Abughali converted approximately $6,083 from Tether into U.S. dollars, which are transfers that used the U.S. correspondent banking system.

   iii. Tether Address-WGy

35.     Abughali, through username @Ahmed879900, provided Address-WGy as an alternative method, after BuyCash was sanctioned by OFAC, to continue to use BuyCash's financial services.

36.     A review of the photographs of the owner of Account-1098 produced from Financial Institution 1 and from the Telegram profile marketing Address-WGy as a n alternative method to send funds to BuyCash after its OFAC-designation indicates Abughali as the owner of both Account-1098 and Address-WGy.

37.     Furthermore, Address-WGy was also involved in a transaction initiated within FixedFloat Exchange[4] through email address buycash0@gmail.com.

---

[4] FixedFloat Exchange is an automated non-custodial service that allows uses to immediately exchange virtual currencies and tokens for others without requiring user registrations or Know Your Customer verifications often at favorable rates.

iv.    Tether Addess-nVF

38.    Between on or about November 5, 2021, until the present time, Address-nVF conducted approximately 28,751 transactions with a total volume of the equivalent of approximately $396,305,742 USD.

39.    Blockchain analysis revealed that the person controlling the email account buycash0@gmail.com controlled both Address-WGy and Address-nVF. Through blockchain analysis the investigation found that Address–nVF conducted transactions with Exchange 3. Specifically, on or about July 2023, the user of email address buycash0@gmail.com initiated a "crypto swap"[5] between Address-nVF and Address-WGy through Exchange 3.

40.    From on or about November 5, 2021, through on or about January 8, 2022, through multiple transactions, Address-nVF sent approximately $141,927 USD to Account-1098. Account-1098 was the account that was previously used to facilitate the receipt of funds intended to support various FTOs.

v.    Binance Account-0091

41.    As indicated in Paragraph 32, Abughali's U.S.-registered bank account was registered with the email address buycash222@gmail.com. This same email address was used to register Account-0091 with Binance under the name of Nirmeen Kimal Hasni Mousa ("Mousa") with the same telephone number that was listed as BuyCash's contact number.

42.    Account-0091 received U.S. dollars from Financial Institution 1, using that financial institution's use of the U.S. correspondent banking system. Mousa converted

---

[5] A crypto swap is a transaction where one virtual currency asset is traded with an equivalent value of a different virtual currency asset.

approximately $258,433 from accounts with Tether into U.S. dollars, using Tether's relationships with the U.S. correspondent banking system.

43.     Additionally, between on or about January 22, 2022, and on or about June 26, 2023, Account-0091 received the equivalent of approximately $508,000 USD from Address-nVF.

44.     Furthermore, as of about September 2023, Account-0091 received the equivalent of approximately $13,227 USD from Address-WGy.

45.     Analysis of the account access records indicate that a single mobile device (Device 1) was used to access both Account-1098 and Account-0091 in different locations including the West Bank territory and Turkey.

      vi.     Binance Account-922 and Account-6855

46.     Both Account-9222 and Account-6855 are registered to Abughali  by name and was also initiated through email addresses and telephone numbers associated with BuyCash.

47.     Analysis of the account access records indicate that a single mobile device (Device 2) was used to access both Account-9222 and Account-6855 in different locations including the West Bank territory and Turkey.

      vii.     Binance Account-0638 and Account-6631

48.     Both Account-0638 and Account-6631 were accessed by Device 2. Account-0638 is registered to Saed A. H. Othman ("Othman") and was accessed by Device 2 on December 30, 2022, from the Gaza Strip. Account-6631 is registered to Suha Alaqad ("S. Alaqad"), and was accessed by Device 2 on August 29, 2023, also from the Gaza Strip.

49.     Law enforcement investigation revealed that the email address, sahaomer1980@gmail.com registered for Account-6631 is linked to BuyCash email addresses buycash.com@gmail.com and buycash0@gmail.com.

viii.    Tether Address-mgL

50.    According to blockchain analysis, Address-WGy first became active on July 3, 2023. The first transaction transferring funds into Address-WGy was a transfer of approximately 110,000 Tether coin (USDT) which occurred on or about July 3, 2023.[6]  Also on July 3, 2023, Address-WGy received 1,295 Tron coin (TRX), valued at approximately $101 at the time, from TAUEULGrn3msvqqGqeeDzz2fEWZhTpdmgL ("Address-mgL").  TRX is often used to pay or to facilitate payment of the transaction fees required to exchange USDT on the blockchain.  Based on my training and experience, I know that TRX funding transactions can often reveal addresses controlled by a single entity.  In addition, on July 10, 2023, Address-WGy sent approximately 3,000 USDT to Address-mgL.



51.    Further investigation revealed that between on or about May 9, 2022, and June 27, 2023, Address-mgL engaged in multiple transactions with Address-nVF. As discussed above at paragraph 38-45, Address-nVF appears to be controlled by the same user or users, including but

---

[6]    The July 3, 2023, transfer of 110,000 Tether coin into Address-WGy came from address TKZfDW3y77LE8jNRGaCGSZ2fUhokmeGgCm ("Address-gCm").  Address-gCm appears to have been created to serve solely as a funding wallet.  Address-gCm became active on July 3, 2023, and was no longer active after that day.  On July 3, 2023, Address-gCm received the equivalent of approximately $174,029 USD from 20 different Garantex virtual currency addresses. Garantex is an OFAC-sanctioned Russian exchange that was sanctioned on November 18, 2019.

not limited to user @Ahmed879900/Abughlai, who controls Address-WGy and who controls the email address featured on the BuyCash Exchange website, buycash0@gmail.com. Address-mgL sent the equivalent of approximately $520,900 to Address-nVF and received the equivalent of approximately $432,800 from Address -nVF.   On multiple instances, Address-mgL also provided Tron coins to Address-nVF.

52.    Furthermore, from on or about May 9, 2022, to April 17, 2023, Address-mgL sent and received funds totaling the equivalent of approximately $29,525 USD to and from an address affiliated with the Palestinian Islamic Jihad.[7]   The Department of State designated the Palestinian Islamic Jihad on October 8, 1997, as a foreign terrorist organization ("FTO").   OFAC designated the Palestinian Islamic Jihad as a Specifically Designated National ("SDN") on October 31, 2001, under E.O. 13224[8] and a Specifically Designated Global Terrorist ("SDGT") on November 2, 2001.[9]

### ix.    Tether Address-t5t

53.    Address-t5t first became active on or about March 29, 2021, and remains active to date. It has conducted at least 26,574 transactions valued at approximately $668,779,971 USD. Among those transactions, Address-t5t sent the equivalent of approximately $373,450 USD to various sanctioned or illicit entities and jurisdictions on 14 different occasions, such as Garantex[10]

---

[7]     The virtual currency address affiliated with the Palestinian Islamic Jihad was TXXfxvnjg4497duutm5uEHUgqAhSVoM4nS.
[8]     https://www.state.gov/executive-order-13224/; https://ofac.treasury.gov/recent-actions/20011102
[9]     https://ofac.treasury.gov/recent-actions/20011102
[10] Garantex was sanctioned by OFAC pursuant to Executive Order 14024 for operating and having operated in the financial services of the Russian Federation Economy. https://home.treasury.gov/news/press-releases/jy0701

(a Russian virtual currency exchange), Nobitex [11] (an Iranian virtual currency exchange) and Wallet.ir (an Iranian virtual currency exchange). Furthermore, Address-t5t conducted approximately 128 transactions, valued at approximately $3,463,089 USD, with known terrorist "charities" and sanctioned entities, such as the Palestinian Islamic Jihad (PIJ), [12] Dubai Company For Exchange, [13] and other intermediaries. From on or about March 5, 2022, until on or about April 18, 2023, Address-t5t sent the equivalent of approximately $529,300 USD to a PIJ-affiliated virtual currency address [14] and received from that same PIJ-affiliated address the equivalent of approximately $350,500.

54.    Blockchain analysis revealed that from on or about June or July 2023 to the present, Address-WGy and Address-nVF both received funds from the virtual currency address Address-t5t. From on or about July 11, 2023, to October 18, 2023, Address-t5t sent the equivalent of approximately $1,769,130 to Address-WGy.

55.    Between on or about November 17, 2021, and on or about June 20, 2023, Address-t5t sent the equivalent of approximately USD$11,800,000 to Address-nVF. On June 12, 2023, Address-nVf sent the equivalent of approximately USD$100,000 to Address-t5t.

---

[11]    https://www.reuters.com/business/finance/exclusive-crypto-exchange-binance-helped-iranian-firms-trade-8-billion-despite-2022-11-04/; https://www.chainalysis.com/blog/ofac-sanctions-iran-september-2022/.

[12]    *See* https://www.state.gov/executive-order-13224/; https://ofac.treasury.gov/recent-actions/20011102; and https://ofac.treasury.gov/recent-actions/20011102.

[13]    https://www.reuters.com/world/middle-east/new-crypto-front-emerges-israels-militant-financing-fight-2023-11-27/.   Dubai Company For Exchange was designated a terrorist entity by Israel due to the aid that they provide to the Hamas terrorist organization, particularly its military arm, in transferring funds on a scale of tens of millions of dollars a year. Khader Dan - who is the owner and manager of the exchange, is a prominent money exchanger in the service of Hamas and is a key figure in Hamas' economic infrastructure.

[14]    The PIJ-affiliated address is TDAegnxRRBVuRFJ1tkpmignshcu12nfoQF.

x.    Tether Address-GvDc and Binance Account-7294

56.    The virtual currency address TBH3kjMQaAnVdD3bepTCzhH4nYCY9TGvDc ("Address-GvDc") has received funds from at least two of the addresses discussed above on numerous occasions. From approximately August 29, 2023, to October 20, 2023, Address-WGy sent the equivalent of approximately USD$565,272 to Address-GvDc, and on May 4, 2023, Address-nVF sent approximately USD$24,659 to Address-GvDc.

57.    After receiving funds from BuyCash-affiliated addresses, Address-GvDc repeatedly transferred funds of the same or similar value to Binance Account 788177294 ("Account-7294"). Account-7294 is registered to a El Moustafa Moutaki ("Moutaki"). Examples of this activity occurred at the following instances:

a.    On October 14, 2023, at 1:10 p.m. U.T.C., Address-WGy sent approximately 100,000 USDT to wallet address Address-GvDc.  Less than an hour later, at 1:55 p.m. U.T.C., Address-GvDc sent approximately 100,000 USDT to Account-7294.

b.    On October 17, 2023, at 10:08 a.m. U.T.C., Address-WGy sent approximately 57,921 USDT to Address-GvDc.   Less than three hours later, at 12:48 p.m. U.T.C., Address-GvDc sent approximately 57,921 USDT to Account-7294.

c.    On October 18, 2023, at 4:15 p.m. U.T.C., Address-WGy sent approximately 109,285 USDT to Address-GvDc.  Less than 20 minutes later at 4:34 p.m. U.T.C., Address-GvDc sent approximately 109,405 USDT to Account-7294.

d.    On October 19, 2023, at 12:08 p.m. U.T.C., Address-WGy sent approximately 99,400 USDT to Address-GvDc.  Less than two hours later, at 1:26 p.m. U.T.C., Address-GvDc sent approximately 99,400 USDT to Account-7294.

58.     The chart below shows fund transfers from Address-WGy to Address-GvDc and from Address-GvDc to Account-7294 from on or about August 29, 2023, to on or about October 21, 2023.   From approximately October 3, 2023, to October 21, 2023, Address-GvDc sent the equivalent of approximately $1,644,209 to Account-7294.   Similar transactions are color coded.



      xi.    Tether Address-Zwm2

59.    Through blockchain analysis, the investigation revealed that Address-WGy transferred cryptocurrency assets through a string of virtual currency addresses, with the assets hitting each address for a brief amount of time before being transferred to the next address. As detailed below, one of the ultimate destinations for these funds is the virtual currency address TUvRgYTczesQQho4cL8myZm5qJ3PxwZwm2 ("Address-Zwm2").

60.    For example, on November 14, 2023, Address-WGy sent TRX from Exchange 4[15] to an Egypt-based virtual currency address, TXxm1pLR1ZFKnTjoBv9qp-52pqCZnkHfpAK ("Address-pAK"). On the same day at 1:27 p.m. U.T.C., Address-pAK sent approximately 298,950 USDT to the virtual currency address TNMhG3SMUvCpUsZ5rQ-TyX3SHcCDsA8utWr. Approximately an hour later at 2:27 p.m. U.T.C. and again at 2:52 p.m. U.T.C., virtual currency address TNMhG3SMUvCpUsZ5rQTyX3SHcCDsA8utWr sent approximately 148,148 USDT and 242,674 USDT, respectively, to Account-7294. On or about November 14, 2023, at 2:40 p.m. U.T.C., Account-7294 sent approximately 148,147 USDT to Address-Zwm2. Approximately 37 minutes later, Account-7294 sent approximately 242,684 USDT to Address-Zwm2. These transactions are depicted below.

| Date | Time | Sending Address | Receiving Address | Amount |
|---|---|---|---|---|
| 11/14/2023 | 1:45 PM | Address -WGy | Address - pAK | 100 TRX |
| 11/14/2023 | 1:27 PM | Address - pAK | Address- utWr | 298,950 USDT |
| 11/14/2023 | 2:27 AM | Address- utWr | Account –7294 | 148,148 USDT |
| 11/14/2023 | 2:40 PM | Account –7294 | Address -Zwm2 | 148,147 USDT |
| 11/14/2023 | 2:52 PM | Address- utWr | Account –7294 | 242,674 USDT |
| 11/14/2023 | 3:17 PM | Account –7294 | Address -Zwm2 | 242,684 USDT |

---

[15] Exchange 4 is a non-custodial cryptocurrency-to-cryptocurrency exchange service provider without fiat exchange capabilities. The platform offers users the ability to exchange one cryptocurrency for another through a variety of optimized exchange paths often using third-party exchanges.

61.     From between on or about October 2, 2023, and on or about November 15, 2023, Address-Zwm2 received the equivalent of approximately $4,082,217 from Account-7294.   On or about November 16, 2023, Address-Zwm2 was frozen at the request of the law enforcement.

62.     These types of money transfers are a classic money laundering technique, as they intend to disguise the nature, location, ownership, and control of the funds being transferred, as well as being circumstantial evidencee that the funds are all proceeds of money laundering transactions.   Also, the technique of quickly transferring virtual currency assets from one wallet to another quick in time is a means for sanctioned entities like BuyCash to attempt to hide assets from law enforcement and prevent the assets from being lawfully seized.

       xii.    <u>Binance Account-0256</u>

63.     The investigation also revealed that Abughali is the registered owner of Binance account 797560256 ("Account-0256").   In addition, on November 6, 2023, Account-0256 received approximately 1000 USDT from Address-pAK.   As noted above, Address-pAK is based in Egypt and was used as a temporary pass-through address for the transfer of funds between Address-WGy, connected with Abughali, and Address-Zwm2, associated with Moutaki. It was also revealed that on or about November 16, 2023, Account-0256 was accessed from Cairo, Egypt.

       xiii.    <u>Tether Address-JnC, Tether Address-B1o6, and Tether Address-VGKP</u>

64.     Based upon the investigation, virtual currency addresses Address-B1o6, Address-JNc, and Address-VGKP are being used to provide assets to Address-WGy in a series of multi-step transactions intended to obscure the sources of the funds and/or destination of the funds, as well as to evade sanctions.

65.     Virtual currency addresses Address-JNc, Address-B1o6, and Address-VGKP have engaged in numerous transactions with each other and have provided significant assets to Address-

WGy. For example, on or about September 27, 2023, at 7:39 p.m. U.T.C., Address-WGy sent approximately 117 Tron coin (TRX) to the virtual currency address TQsx6EpJ2B39thMzsEzpJ2Txq9Rq2wBJNc ("Address-JNc"). Approximately six minutes later at 7:45 p.m. U.T.C., Address-JNc sent approximately 127,186 Tether coin (USDT) to Address-WGy.



66.     Between on or about September 26, 2023, and on or about October 19, 2023, the virtual currency address Address-B1o6 sent the equivalent of approximately USD $3,170,710 to Address-WGy.

67.     Between on or about September 26, 2023, and on or about October 21, 2023, Address-JNc sent the equivalent of approximately $3,470,000 to Address-B1o6.  Over the same period, Address-B1o6 sent the equivalent of approximately $245,500 to Address-JNc.

68.     Between on or about October 15, 2023, and October 30, 2023, the virtual currency address TPpv5jxsTso76q5n1jg1qrCNmccbRUVGKP ("Address-VGKP") sent the equivalent of approximately $150,000 to Address-B1o6, thereby intermingling the transferred assets with the assets already contained in Address-B1o6. From Address-B1o6, the assets were then transferred to Address-WGy.

xiv.    Binance Account-744

69.     On or about November 14, 2023, Address-WGy sent approximately 100 Tron Coin (TRX) to Address-pAK. As referenced above, Address-pAK was used to transfer funds quickly

between various virtual currency wallets in an attempt to obfuscate the true source of the illicit funds.



70.    Between on or about October 24, 2023, and on or about November 9, 2023, Address-pAK sent approximately $381,651 to Account-744.

71.    From on or about July 3, 2023, to on or about October 16, 2023, Address-WGy sent approximately $3,686,981 to Account-744. From on or about November 9, 2022, to on or about June 4, 2023, Address-nVF sent approximately $19,111,105 to Account-744.

72.    As previously discussed, Abughali, through username @Ahmed879900, provided Address-WGy as an alternative method, after BuyCash was sanctioned by OFAC, to continue using BuyCash's financial services. Furthermore, blockchain analysis revealed that the person controlling the email account buycash0@gmail.com controlled both Address-WGy and Address-nVF.

73.    Between on or about November 14, 2022, and July 10, 2023, Address-mgL sent approximately $93,230 to Account-744.



74.    The registered owner of ***Account-744*** is a Korean national Bagsubong a/k/a Park Soo-Bong.

75.    OFAC, which is located in the District of Columbia, has reported that, prior to the initiation of the present investigation, no licenses were sought by the relevant entities related to the above-described U.S. financial transactions.

### COUNT ONE – FORFEITURE
### 18 U.S.C. § 981(a)(1)(G)(i)

76.    The United States incorporates by reference the allegations set forth in Paragraphs 1 to 75 above as if fully set forth herein for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(G)(i).

77.    Hamas is a designated foreign terrorist organization.

78.    The Defendant Properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(G)(1), as foreign assets of Hamas, a designated foreign terrorist organization, which

has engaged in planning and perpetrating federal crimes of terrorism as defined in 18 U.S.C. § 2332b(g)(5) against the United States, citizens or residents of the United States, or their property.

79.     The Defendant Property also, or alternatively, affords persons (including those providing funds within, and managing, the related accounts) sources of influence for Hamas within the meaning of 18 U.S.C. § 981(a)(1)(G)(i).

## COUNT TWO – FORFEITURE
### 18  U.S.C. § 981(a)(1)(A)

80.     The United States further incorporates by reference the allegations set forth in Paragraphs 1 to 75 above as if fully set forth herein for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 981(a)(1)(A).

81.     Hamas is a designated foreign terrorist organization.

82.     The Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property involved in a violation of 18 U.S.C. § 1956(a)(2)(A), and any property traceable to such property.

## COUNT THREE – FORFEITURE
### 18  U.S.C. § 981(a)(1)(C)

83.     The United States further incorporates by reference the allegations set forth in Paragraphs 1 to 75 above as if fully set forth herein for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 981(a)(1)(C).

84.     Hamas is a designated foreign terrorist organization.

85.     The Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) as property which constitutes or is derived from proceeds traceable to violations of 18 U.S.C. § 1956(a)(2)(A) and 18 U.S.C. § 1956(h) or a conspiracy to commit such an offense.

*        *        *

27

WHEREFORE, the plaintiff prays that all persons who reasonably appear to be potential claimants with interests in the Defendant Property be cited to appear herein and answer the complaint; that the defendant property be forfeited and condemned to the United States of America; that upon Final Decree of Forfeiture, the United States Marshal dispose of the defendant property according to law; and that the plaintiff have such other and further relief as this Court deems proper and just.

Dated: April 26, 2024

      Washington, D.C.

                        Respectfully submitted,

                        MATTHEW M. GRAVES
                        United States Attorney

                        By:      */s/ Rajbir Datta*
                        RAJBIR DATTA
                            N.Y. Bar 5206073
                        THOMAS SAUNDERS
                        Assistant United States Attorneys
                        601 D Street, N.W.
                        Washington, D.C. 20579
                        (202) 252-7687 (Datta)
                        Rajbir.Datta@usdoj.gov

                        MARGARET A. MOESER
                        Acting Chief; Money Laundering and Asset Recovery Section

                        By:      */s/ Allison Ickovic*
                        ALLISON ICKOVIC
                        Trial Attorney
                        U.S. Department of Justice
                        Money Laundering and Asset Recovery Section
                        1400 New York Avenue NW, 10100
                        Washington, DC  20530(202) 514-1263
                        Allison.ickovic@usdoj.gov

## <u>VERIFICATION</u>

I, ███████████, a Special Agent with the Homeland Security Investigations, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *In Rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 26th day of April 2024.

___/s/_█████_____
Special Agent ███████████
Federal Bureau of Investigation